UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 07/18/2024
```

-----------------------------------------------------------------X
                        :

MINTABLE PTE. LTD.,                  :

             Plaintiff,        :

                        :        23-cv-8215 (LJL)

       -v-               :

                        :      <u>OPINION AND ORDER</u>

MINTOLOGY INC. and CINDY JIN,     :

                        :

            Defendants.    :

-----------------------------------------------------------------X

LEWIS J. LIMAN, United States District Judge:

      Plaintiff Mintable Pte. Ltd. ("Plaintiff") brings this action against Defendants Mintology Inc. ("Defendant" or "Mintology Inc.") and Cindy Jin (both in her individual capacity and as CEO of Mintology, Inc.) alleging trademark infringement and trademark dilution. Dkt. No. 11 ("Complaint" or "Compl."). Plaintiff voluntarily dismissed all claims against Jin, Dkt. No. 20, but Mintology Inc. has not appeared in this action or answered the Complaint. Plaintiff obtained a certificate of default as to Mintology Inc. from the Clerk of Court, Dkt. No. 18, and now moves for default judgment pursuant to Fed. R. Civ. P. 55(b)(2) and for a permanent injunction pursuant to Fed. R. Civ. P. 65 as well as the awarding of attorneys' fees, Dkt. No. 33.

      For the following reasons, the motion for default judgment is granted.

**BACKGROUND**

      The Court accepts as true the well-pleaded allegations of the Complaint for purposes of this motion. *Mt. Hawley Ins. Co. v. Buckeye Real Est. Invs. LLC*, 2024 WL 323334, at *1 (S.D.N.Y. Jan. 29, 2024).

A.      **Plaintiff Mintable Pte. Ltd.**

Plaintiff is a Singapore-based company that operates a non-fungible token ("NFT") services platform.[1]  Compl. ¶ 11.  Among other services, Plaintiff offers a business-to-business ("B2B") platform through its Mintology division, which provides corporate clients with a platform and infrastructure to launch NFT campaigns.  *Id.* ¶ 16.  Plaintiff chose the unique moniker "mintology" after research revealed that no other company in the NFT or technology space was using that name.  *Id.* ¶ 17.  Plaintiff launched the Mintology division as its B2B division in the summer of 2021 after significant planning, development and effort.  *Id.* ¶ 16.  On July 9, 2021, Plaintiff registered the "mintology.app" domain name, which it continues to use.  *Id.* ¶ 19.  In August 2021, Plaintiff promoted the new platform by sending slide decks to potential clients advertising its plans to make the Mintology division a first-class platform on which to purchase and exchange NFTs.  *Id.* ¶ 20.  By the summer and fall of 2021, companies in a range of industries had expressed interest in the Mintology division, including companies in the sports marketing, music, artificial intelligence, gaming, automotive, broadcast, events (ticketing), and embedded tools for creatives and artists industries.  *Id.* ¶ 21.  The Mintology division hired its first employee in September 2021.  *Id.* ¶ 22.

By December 2021, the Mintology division had expanded its reach and entered into contracts and negotiations with several companies across the country, including MasterCard.  *Id.* ¶ 23.  Plaintiff showcased its services at industry shows and panel appearances throughout 2022

---

[1] "NFTs are digital assets whose authenticity and ownership can be recorded on a blockchain." *Friel v. Dapper Labs, Inc.*, 657 F. Supp. 3d 422, 429 (S.D.N.Y. 2023); *see also Hermes Int'l v. Rothschild*, 603 F. Supp. 3d 98, 100 (S.D.N.Y. 2022) ("NFTs, or 'non-fungible tokens,' are units of data stored on a blockchain that are created to transfer ownership of either physical things or digital media.").

and, following this pre-public work and promotion, launched to the general public via an article in a trade publication and on social media. *Id.* ¶¶ 26–29.

### B.     Defendant Mintology Inc.

Defendant Mintology Inc. is an NFT services platform incorporated in Delaware with its principal place of business in New York. *Id.* ¶ 12.

Mintology Inc. created the "mintology.studio" domain and Twitter account in August 2021, but did not have an operational website until early 2022. *Id.* ¶¶ 32–33. According to Mintology Inc.'s U.S. Patent and Trademark Office ("USPTO") Trademark/Service Mark Application filed on August 26, 2022, Mintology Inc. first used the "Mintology" name in commerce at least as early as December 6, 2021. *Id.*, Ex. 1. Initially, Mintology Inc.'s site was an NFT launchpad and studio, promoting NFT "drops" such as the "Cheeky Corgi" NFT presale. *Id.* ¶¶ 3, 12, 31, 33.

In or around August 2022—approximately one year after Plaintiff had begun using the "Mintology" mark with prospective brands and investors—Defendant pivoted its business model to mirror Plaintiff's B2B business model and provide NFT services to brands. *Id.* ¶ 35.

### C.     Plaintiff's Cease-And-Desist Letters

Plaintiff sent its first cease-and-desist letter to Defendant on August 11, 2022, asserting Plaintiff's senior claim to the mark and stating that Defendant's continued use of the mark would constitute possible infringement because such continued use would "damage [Plaintiff's] goodwill and reputation" because there is a high likelihood of consumer confusion. *Id.* ¶¶ 37–38, Ex. 3. Defendant did not respond. *Id.* ¶ 39.

Approximately two weeks later, on August 26, 2022, Defendant filed a trademark application with the USPTO for the "Mintology" name. *Id.*, Ex. 1. In the application, Defendant falsely attested that no other person had the right to use the mark in commerce. *Id.*

On August 31, 2022, Plaintiff sent a letter following up on the August 11 cease-and-desist letter. *Id*. ¶ 42, Ex. 4. Defendant still did not respond to either letter. *Id*. ¶ 42. On September 14, 2022, Plaintiff sent a reminder regarding the cease-and-desist letter to Jin via Twitter and Instagram. *Id*. ¶ 43. Defendant still did not respond. *Id.*

On May 24, 2023, Plaintiff sent another cease-and-desist letter stating that Defendant was knowingly infringing on Plaintiff's trademark, that its use of the trademark was made with the apparent intent to trade on the goodwill associated with Plaintiff's mark, and that its attempt to register the mark after receiving notice of Plaintiff's senior use of the mark evinced bad faith. *Id.* ¶ 44, Ex. 5. The letter requested that Defendant immediately cease and desist from all further use of the mark, cancel the trademark registration, deactivate all social media accounts, and respond to Plaintiff to ensure an amicable resolution. *Id.* This letter also went unanswered. *Id.* ¶ 45.

On June 8, 2023, Plaintiff sent a letter to the law firm that assisted Defendant in filing its trademark application. *Id.* ¶ 46. Plaintiff attached the May 24, 2023 cease-and-desist letter and informed the law firm that potential litigation might ensue if Defendant did not cease using the Mintology name. *Id.* Though the law firm acknowledged receipt of the letter and confirmed it had contacted their client, Plaintiff heard nothing further. *Id.* ¶ 47.

As of September 20, 2023, the date Plaintiff filed its Amended Complaint, Defendant had last updated the mintology.studio domain name on July 24, 2022. *Id.* ¶ 51. Defendant's social media pages, which last promoted a hotel giveaway, had not been updated since February 27, 2023. *Id.* Plaintiff's memorandum of law in support of its motion for default judgment notes that in October 2023 Defendant moved its operations to a new website, "app.mintology.studio," purporting to provide "Hot Brand Deals" via defunct links. Dkt No. 26 at 4 n.1, 10, 12.

D. **Confusion Between Plaintiff's And Defendant's Products**

Since sending the cease-and-desist letters, Plaintiff has continued to expand. Compl. ¶ 50. It has signed multiple contracts for fees ranging from $10,000 to $150,000 with both new and existing clients and has expanded its international reach. *Id.* Plaintiff continues to use the "Mintology" mark in commerce today. *Id.* ¶¶ 50–52.

Despite this expansion, the overlap between Plaintiff's and Defendant's use of the "Mintology" mark has caused confusion. Journalists have mistakenly asked Plaintiff's chief executive officer questions about Defendant. *Id.* ¶ 52. Potential partners and suppliers have mistaken the companies. *Id.* Plaintiff's own external marketing firm referenced Defendant's data and information while providing services to Plaintiff. *Id.* Additionally, candidates interviewing with Plaintiff have confused Plaintiff's Mintology division with Defendant's website. *Id.*

## PROCEDURAL HISTORY

Plaintiff filed this action on September 18, 2023, asserting claims against Mintology Inc. and Jin for trademark infringement pursuant to the Trademark Act of 1946, 15 U.S.C. § 1125 ("Lanham Act"), fraudulent procurement pursuant to 15 U.S.C. § 1120,[2] common law trademark infringement, and dilution under New York state law. Dkt. No. 1 ¶ 1, ECF 13–18. On September 20, 2023, Plaintiff refiled the complaint, attaching six exhibits it had inadvertently omitted from the initial filing.

On September 21, 2023, a process server served Defendant, with the summons and Complaint and exhibits thereto. Dkt. No. 14. Defendant did not answer or respond to the Complaint or otherwise appear in the case. Dkt. No. 18.

---

[2] Plaintiff did not move for default judgment on its claim for false or fraudulent procurement under the Lanham Act, acknowledging that the claim is not yet ripe because Defendant has failed to procure the trademark. Dkt. No. 26 at 7 n.2.

Plaintiff filed a notice of voluntary dismissal as to Jin on December 18, 2023 and Jin was dismissed from the case on December 20, 2023.  Dkt. Nos. 19–20.

After Defendant failed to timely answer, appear, or otherwise respond to the Complaint, Plaintiff sought and obtained from the Clerk of Court a Certificate of Default against Defendant. Dkt. No. 18.  On April 2, 2024, Plaintiff moved for default judgment against Defendant pursuant to Federal Rule of Civil Procedure 55(b)(2).  Dkt. No. 25.

Plaintiff seeks: (1) declaratory relief as to the parties' rights and obligations regarding the mark "Mintology;" (2) a permanent injunction enjoining Defendant from infringing on Plaintiff's mark; and (3) an award of Plaintiff's attorneys' fees in this action.[3]  Compl. at 13–19.

## LEGAL STANDARD

Federal Rule of Civil Procedure 55 sets forth a two-step procedure to be followed for the entry of judgment against a party who fails to defend: the entry of a default and the entry of a default judgment.  *See New York v. Green*, 420 F.3d 99, 104 (2d Cir. 2005).

The first step, entry of a default, simply "formalizes a judicial recognition that a defendant has, through its failure to defend the action, admitted liability to the plaintiff."  *City of New York v. Mickalis Pawn Shop, LLC*, 645 F.3d 114, 128 (2d Cir. 2011); *see also* Fed. R. Civ. P. 55(a). The second step, entry of a default judgment, "converts the defendant's admission of liability into a final judgment that terminates the litigation and awards the plaintiff any relief to which the court decides it is entitled, to the extent permitted by Rule 54(c)."  *Mickalis Pawn Shop*, 645 F.3d at 128; *see also* Fed. R. Civ. P. 55(b).  Whether entry of default judgment at the second step is

---

[3] The Complaint requests disgorgement of Defendant's profits, but Plaintiff has not included this in subsequent motions and has not provided the requisite calculations for this Court to determine the propriety or amount of any disgorgement.

appropriate depends on whether the well-pleaded allegations against the defaulting party establish liability as a matter of law.  *See Mickalis Pawn Shop*, 645 F.3d at 137.

While a defendant who defaults admits the well-pleaded factual allegations in a complaint, because the defaulting party does not admit conclusions of law, "a district court need not agree that the alleged facts constitute a valid cause of action."  *Id.* (citation omitted); *see Spin Master Ltd. v. 158*, 463 Supp. 3d 348, 367 (S.D.N.Y. 2020) ("The essence of Fed. R. Civ. P. 55 is that a plaintiff can obtain from a default judgment relief equivalent to but not greater than it would obtain in a contested proceeding assuming it prevailed on all of its factual allegations.").  Therefore, this Court is "required to determine whether [Plaintiff's] allegations are sufficient to establish [Defendant's] liability as a matter of law."  *Finkel v. Romanowicz*, 577 F.3d 79, 84 (2d Cir. 2009).

The legal sufficiency of a non-defaulting party's claims "is analyzed under the familiar plausibility standard enunciated in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), aided by the additional step of drawing inferences in the movant's favor."  *WowWee Grp., Ltd. v. Meirly*, 2019 WL 1375470, at *5 (S.D.N.Y. Mar. 27, 2019) (Nathan, J.).  A default judgment entered on well-pleaded allegations does not reach the issue of damages, and Plaintiff "must therefore substantiate its claim for damages with evidence to prove the extent of those damages."  *Kelly Toys Holdings, LLC v. Airpods Pro Store*, 2022 WL 2801077, at *3 (S.D.N.Y. July 18, 2022) (citation omitted).

## JURISDICTION

Plaintiff brings claims under federal trademark law, and the Court accordingly has subject matter jurisdiction pursuant to 15 U.S.C. § 1121(a) and 28 U.S.C. § 1338(a).  The Court has supplemental jurisdiction over Plaintiff's New York trademark and common law claims pursuant to 28 U.S.C. § 1367(a).

**DISCUSSION**

I.    **Trademark Infringement Under the Lanham Act**

Plaintiff seeks default judgment on its claim of trademark infringement in violation of the Lanham Act.  The Lanham Act holds liable any person who, without the consent of the registrant of a mark, "use[s] in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark[,] . . . or . . . reproduce[s], counterfeit[s], cop[ies], or colorably imitate[es]" a registered mark or applies it to advertisements "intended to be used in . . . connection with which such use is likely to cause confusion, or to cause mistake, or to deceive."  15 U.S.C. § 1114(1).

To establish liability under the Lanham Act, a plaintiff must demonstrate that (1) it has a valid trademark entitled to protection and (2) the defendant's imitation of the trademark is likely to cause consumers confusion as to the origin or sponsorship of the defendant's goods.  *Tiffany & Co. v. Costco Wholesale Corp.*, 971 F.3d 74, 84 (2d Cir. 2020).

 An unregistered mark such as Plaintiff's "is entitled to protection under the Lanham Act if it would qualify for registration as a trademark."  *Star Indus., Inc. v. Bacardi & Co.*, 412 F.3d 373, 381 (2d Cir. 2005).  "To qualify for registration a mark must be sufficiently 'distinctive' to distinguish the registrant's goods from those of others."  *Id.*  A plaintiff may demonstrate the mark's distinctiveness in two ways: (1) "a mark may be 'inherently distinctive' if its intrinsic nature serves to identify its particular source" or (2) "even if not inherently distinctive, the mark may be distinctive by virtue of having acquired a 'secondary meaning' in the minds of consumers."  *Id.*  Courts have identified "four categories of increasing inherent distinctiveness: generic, descriptive, suggestive, and arbitrary or fanciful."  *Cross Com. Media, Inc. v. Collective, Inc.*, 841 F.3d 155, 160 (2d Cir. 2016).  If a mark is suggestive, arbitrary, or fanciful, it is inherently distinctive and is entitled to registration without proof of secondary meaning.  *See U.S. Pat. & Trademark Off. v. Booking.com B. V.*, 591 U.S. 549, 553 (2020).

To establish the latter likelihood-of-confusion prong, the Court considers the eight factors outlined in *Polaroid Corp. v. Polarad Elecs. Corp.*, 287 F.2d 492 (2d Cir. 1961). However, "in cases involving counterfeit marks, it may be 'unnecessary to perform the step-by-step examination of each *Polaroid* factor,'" particularly in cases where "the goods are also identical and directly competitive." *Chrome Hearts LLC v. Controse Inc.*, 2023 WL 5049198, at *12 (S.D.N.Y. Aug. 8, 2023) (quoting *Philip Morris USA Inc. v. Felizardo*, 2004 WL 1375277, at *5 (S.D.N.Y. June 18, 2004)).

### A.    Entitlement To Protection

Under the first prong, the mark is protectible because it is suggestive and therefore would qualify for registration. *See Gameologist Grp., LLC v. Sci. Games Int'l, Inc.*, 508 F. App'x 31, 32 (2d Cir. 2013) ("An unregistered mark is entitled to protection . . . if it would qualify for registration as a trademark." (quoting *Star Indus.*, 412 F.3d at 381)). "Suggestive marks suggest (rather than directly describe) the product on which they are employed, or its attributes, sometimes requiring imagination to grasp the linkage." *RiseandShine Corp. v. PepsiCo, Inc.*, 41 F.4th 112, 121 (2d Cir. 2022).

"Mintology" is derived from the term "minting," referencing the act of creating an NFT.[4] While the term may thus appear to describe Plaintiff's product, it nonetheless requires reasoning and thought to intuit the attributes of the product from the mark itself. *See* McCarthy on Trademarks and Unfair Competition § 11:67 (5th ed.) ("The more imagination that is required on the potential customer's part to get some direct description of the product from the designation, the more likely the designation is suggestive, not descriptive."); *compare Playtex Prods., Inc. v.*

---

[4] *See Friel*, 657 F. Supp. 3d at 429 (Defendant creates (or, in crypto parlance, 'mints') a game highlight into an NFT."); *Hermes Int'l*, 603 F. Supp. 3d at 100 ("When NFTs are created, or 'minted,' they are listed on an NFT marketplace where NFTs can be sold, traded, etc.").

*Ga.-Pac. Corp.*, 390 F.3d 158, 164 (2d Cir. 2004) (finding "Wet Ones" mark used for moist towelettes was suggestive) *superseded by statute on other grounds as recognized in Starbucks Corp. v. Wolfe's Borough Coffee, Inc.*, 588 F.3d 97, 107–08 (2d Cir. 2009) *with Thompson Med. Co. v. Pfizer Inc.*, 753 F.2d 208, 216–17 (2d Cir. 1985) (finding "Sportscreme" mark used for topical analgesic designed for sports participants was descriptive).  The term "Mintology" "describes an attribute of the product but could plausibly describe a wide variety of other products as well" and is therefore suggestive.  *Cross Com. Media*, 841 F.3d at 163 (citation omitted).

Because the term is suggestive of the service it provides in the NFT space and thus registrable without proof of secondary meaning, Plaintiff's mark is entitled to protection.  *See Booking.com B.V.*, 591 U.S. at 553.  However, suggestive marks "receive a narrower scope of protection than the protection accorded to arbitrary or fanciful marks[.]"  *RiseandShine*, 41 F.4th at 121.  Notably, "[a] finding of suggestiveness does not guarantee a determination that the mark is a strong one."  *Chrome Hearts*, 2023 WL 5049198, at *16 (quoting *RiseandShine*, 41 F.4th at 121).

## B.    Likelihood Of Confusion

Under the second prong, Plaintiff has not established that the marks are likely to cause confusion.  The *Polaroid* test comprises eight factors: (1) the strength of the plaintiff's mark, (2) the degree of similarity between the two marks, (3) the proximity of the parties' areas of commerce, (4) the likelihood that the plaintiff will bridge the gap separating their areas of activity, (5) actual consumer confusion, (6) whether the defendant acted in bad faith or was otherwise reprehensible in adopting the mark, (7) the quality of the defendant's product, and (8) the sophistication of the relevant consumer group.  *Polaroid Corp.*, 287 F.2d at 495.

The *Polaroid* factors must be considered holistically; "the evaluation of the *Polaroid* factors is not a mechanical process 'where the party with the greatest number of factors weighing

in its favor wins.'" *Paddington Corp. v. Attiki Importers & Distributors, Inc.*, 996 F.2d 577, 584 (2d Cir. 1993) (quoting *Physicians Formula Cosms., Inc. v. W. Cabot Cosms., Inc.*, 857 F.2d 80, 85 (2d Cir. 1988)).  In evaluating these factors, the "ultimate question" for the Court is "whether consumers are likely to be confused."  *Nabisco Inc. v. Warner-Lambert Co.*, 220 F.3d 43, 46 (2d Cir. 2000) (citation omitted); *see also Jackpocket, Inc. v. Lottomatrix NY LLC*, 645 F. Supp. 3d 185, 259 (S.D.N.Y. 2022) ("[T]he focus of the confusion analysis must be on the confusion that *consumers* have suffered as a result of the similarity between the marks.").

### 1.     Strength of Plaintiff's Mark

"The strength of a trademark is assessed based on either or both of two components: (1) the degree to which it is inherently distinctive; and (2) the degree to which it has achieved public recognition in the marketplace, sometimes called acquired strength."  *RiseandShine Corp.*, 41 F.4th at 120 (citation omitted).  A suggestive mark, while inherently distinctive, may still be a weak mark.  *Id.*  "In the absence of any showing of secondary meaning, suggestive marks are at best moderately strong."  *Star Indus.*, 412 F.3d at 385.

First, even without a showing of secondary meaning, the mark is moderately strong.  In its ordinary meaning, "mint" suggests the act of creating money—or in this case, NFTs—and together with the suffix "ology," the study of creating NFTs.  Getting from "Mintology" to Plaintiff's product requires imagination and "Mintology" could well refer to a variety of different products. *See Cross Com. Media*, 841 F.3d at 163–64 ("The meaning of a suggestive mark typically evokes an array of goods, which means that consumers must make an additional mental effort to identify the associated product in particular.").  Plaintiff's mark does not describe the product's primary attribute or whole functionality, but is instead several steps removed.  *Cf. Jackpocket*, 645 F. Supp. 3d 240 ("Jackpocket" mark used for lottery ticket service was both descriptive and weak because it "incorporate[d] the word 'jackpot,' the very purpose of a lottery, in a conspicuous manner and

[did] not contain sufficient additional content to create distance between the mark and the product it is describing.")

"To establish secondary meaning, a manufacturer must show that, in the minds of the public, the primary significance of a product feature or term is to identify the source of the product rather than the product itself." *Inwood Lab'ys, Inc. v. Ives Lab'ys, Inc.*, 456 U.S. 844, 851 n.11 (1982). To assess the existence of a secondary meaning, the Second Circuit has consulted evidence regarding "advertising expenditures, consumer studies, sales success, unsolicited media coverage, attempts to plagiarize and length and exclusivity of use." *Bristol-Myers Squibb Co. v. McNeil-P.P.C., Inc.*, 973 F.2d 1033, 1041 (2d Cir. 1992).

The Complaint mentions Plaintiff's participation at industry shows and panels as well as a New York-based publicity campaign, Compl. ¶¶ 26–29, but "the plaintiff has produced no evidence as to the actual costs of these activities nor shown that they were anything but modest[,]" *Gameologist Grp., LLC v. Sci. Games Int'l, Inc.*, 838 F. Supp. 2d 141, 158 (S.D.N.Y. 2011), *aff'd*, 508 F. App'x 31 (2d Cir. 2013). Plaintiff also has not alleged lengthy exclusive use. Plaintiff's use of the "Mintology" mark lasted less than one year before Defendant began to use the mark. *Compare* Compl. ¶ 35 *with* Ex. 1. *See Medici Classics Prods., LLC v. Medici Grp., LLC*, 683 F. Supp. 2d 304, 310 (S.D.N.Y. 2010) (Plaintiff's seven-year-old mark lacked appreciable evidence of secondary meaning).

Plaintiff has, however, enjoyed sales success with a customer base of over one million registered users across 50 countries. Compl. ¶ 30. Plaintiff has also alleged that certain of its marketing programs were successful. *E.g. id.* ¶ 28 (Plaintiff's New York City-wide initiative led to residents claiming over 560 of Plaintiff's NFTs). Additionally, Plaintiff entered into contracts with major companies including MasterCard and Station Casinos. *Id.* ¶ 23.

Ultimately, due to the inherent distinctiveness of Plaintiff's mark and Plaintiff's unchallenged allegations of secondary meaning, the Court finds that Plaintiff's mark is somewhat strong.

### 2.    Degree of Similarity

Second, Defendant not only employs the same "Mintology" name but, during the pendency of this litigation, changed its website from "mintology.studio" to "app.mintology.studio," which much more closely resembles Plaintiff's "mintology.app" domain name. *Id*. ¶¶ 19, 31, 34.  "Where the defendant uses the same mark as the plaintiff's, consumer confusion weighs in favor of the plaintiff." *Hudson Furniture, Inc. v. Mizrahi*, 2023 WL 6214908, at *5 (S.D.N.Y. Sept. 25, 2023); *see also Virgin Enters. Ltd. v. Nawab*, 335 F.3d 141, 149 (2d Cir. 2003) ("In view of the fact that defendants used the same name as plaintiff, we conclude the defendants' mark was sufficiently similar to plaintiff's to increase the likelihood of confusion.").

### 3.    Proximity of Parties' Areas of Commerce

"In considering the proximity of the products, a court should consider whether the two products compete with each other." *Gameologist Grp.*, 838 F. Supp. 2d at 161 (citation omitted). "In examining this factor a court should compare all aspects of the products, including price, style, intended uses, target clientele, typical distribution channels, and others." *Id.*

Both Plaintiff and Defendant use their marks in the same NFT marketplace, targeting the same consumer base, and, in August 2022, Defendant pivoted its business model to mirror Plaintiff's.  Compl. ¶¶ 31, 35, 57, 73.  "Because both parties are competing for the same consumers in the same marketplace, the competitive proximity factor favors Plaintiff." *Jackpocket*, 645 F. Supp. 3d at 259.

### 4.     Bridging the Gap

The fourth *Polaroid* factor "refers to the senior user's interest in preserving avenues of expansion and entering into related fields."  *Hormel Foods Corp. v. Jim Henson Prods., Inc.*, 73 F.3d 497, 504 (2d Cir. 1996) (citation omitted).  Where a plaintiff's and defendant's products are "already in competitive proximity, there is really no gap to bridge, and this factor is irrelevant to the *Polaroid* analysis[.]"  *Star Indus.*, 412 F.3d at 387; *see also Jackpocket*, 645 F. Supp. 3d at 259 (same).

### 5.     Actual Confusion

"Evidence of actual consumer is particularly probative of likelihood of confusion." *Jackpocket*, 645 F. Supp. 3d at, 259.  While consumer surveys are the preferred form of evidence, "anecdotal evidence can sometimes still be used to show confusion, however it must be more than *de minimis*."  *Medici Classics Prods.*, 683 F. Supp. 2d 304 at 313.  "[T]he relevant confusion is that which affects the purchasing and selling of the goods or services in question."  *Lang v. Ret. Living Pub. Co.*, 949 F.2d 576, 583 (2d Cir. 1991) (citation omitted); *Jackpocket*, 645 F. Supp. 3d at 259 ("[T]he focus of the confusion analysis must be on the confusion that *consumers* have suffered as a result of the similarity between the marks.").

Plaintiff provides several forms of anecdotal evidence: candidates interviewing with Plaintiff have confused Defendant's website with Plaintiff's Mintology division, potential suppliers have confused the two companies, and Plaintiff's marketing firm referenced Defendant's data and information when providing marketing services to Plaintiff.  Compl. ¶ 52.  However, these instances of confusion do not pertain to *consumer* confusion.  *See Jackpocket*, 645 F. Supp. 3d at 261 (examples of confusion by media, vendors, potential partners, and non-profit organizations who sought to do business with plaintiff were not probative of consumer confusion); *see also LVL XIII Brands, Inc. v. Louis Vuitton Malletier S.A.*, 209 F. Supp. 3d 612, 638 (S.D.N.Y.

2016) (persons with a pre-established business relationship "are not representative of the typical consumer"), *aff'd* 720 F. App'x 24 (2d Cir. 2017).

Plaintiff's only mention of actual consumers is a vague reference to "potential partners" having mistaken Plaintiff for Defendant. Compl. ¶ 52. This anecdotal evidence is *de minimis* and the actual confusion factor does not weigh in Plaintiff's favor. Neither does it weigh against. Evidence of consumer confusion "is not necessary to show likelihood of confusion." *Hasbro, Inc. v. Lanard Toys, Ltd.*, 858 F.2d 70, 78 (2d Cir. 1988). While "its lack may under some circumstances be used against a plaintiff," the Court is not obligated to draw a negative inference from Plaintiff's lack of such evidence, particularly in light of the short time Plaintiff's and Defendant's products have been on the market. *Id.* Accordingly, the actual confusion factor "neither helps nor hurts" Plaintiff's case. *Id.*

### 6.    Defendant's Bad Faith

Plaintiff has sufficiently alleged Defendant's bad faith in using the mark. In situations where "the defendant is aware of the existence of plaintiff's mark and proceeds to use it . . . a finding of 'bad faith' has been inferred." *Caliko, SA v. Finn & Emma, LLC*, 2022 WL 596072, at *13 (S.D.N.Y. Feb. 28, 2022) (internal citation omitted). Defendant pivoted its business practices to mirror that of Plaintiff's and attempted to register the mark with the USPTO after receiving the first of Plaintiff's many cease-and-desist letters. Compl. ¶¶ 19, 35, 37–47. In its trademark application, Defendant made an affirmative false statement asserting that it had no knowledge of any entities that would claim senior use of the mark even though it had received Plaintiff's first cease-and-desist letter asserting such priority use. *Id.* ¶¶ 16, 19–20, 34, 37–40, 52–59. Defendant's pivot to Plaintiff's business model and its continued use of the mark after receiving cease-and-desist letters demonstrates "bad faith." *See Caliko, SA v. Finn & Emma, LLC*, 2022 WL

596072, at *13; *Star Indus.*, 412 F.3d at 389 ("Bad faith may be inferred from the junior user's actual or constructive knowledge of the senior user's mark.").

However, because the bad faith of the party "does not bear directly on whether consumers are likely to be confused" the sixth *Polaroid* factor bears less weight. *Jackpocket*, 645 F. Supp. 3d at 270 (citation omitted). Instead, a "finding that a party acted in bad faith can affect the court's choice of remedy or can tip the balance where questions are close." *Virgin Enters.*, 335 F.3d at 388.

### 7.    Quality

"Generally, quality is weighed as a factor when there is an allegation that a low quality product is taking unfair advantage of the public good will earned by a well-established high quality product." *Gruner + Jahr USA Publ'g v. Meredith Corp.*, 991 F.2d 1072, 1079 (2d Cir. 1993). "This analysis also does not bear directly on the issue of likelihood of confusion but goes rather 'to the harm that confusion can cause the plaintiff's mark and reputation.'" *Jackpocket*, 645 F. Supp. 3d at 271 (quoting *Virgin Enters.*, 335 F.3d at 151–52).

Plaintiff has sufficiently alleged that Defendant's "Mintology" site offered lesser-quality services. Defendant's website began offering the "Cheeky Corgi" NFT, which was minted in-house, and there is no evidence that it partnered with established businesses once it pivoted to its B2B business model. Compl. ¶ 33. Defendant promoted "Hot Brand Deals" that linked to nonfunctional webpages. Dkt. No. 26 at 10, 12. Defendant's social media has promoted hotel giveaways and was last active in 2023. Compl. ¶ 51. In comparison with Plaintiff's major partners and services model, these facts suggest that Defendant provided lesser-quality services than those offered by the Plaintiff.

### 8.    Sophistication of the Consumer

"The more sophisticated the consumers, the less likely they are to be misled by similarity in marks." *TCPIP Holding Co. v. Haar Commc'ns, Inc.*, 244 F.3d 88, 102 (2d Cir. 2001); *see also Gameologist Grp.*, 838 F. Supp. 2d at 164 ("In general, greater sophistication of consumers reduces likelihood of confusion.").

Plaintiff and Defendant operate in the NFT market, a niche but growing industry.  Compl. ¶ 51.  Plaintiff alleges nothing further that might shed light on the sophistication of its consumers. That said, "the sophistication of buyers cannot be relied on to prevent confusion," particularly in instances where, as here, there is "evidence of actual confusion among several highly sophisticated . . . professionals," such as the journalists, marketing professionals, and prospective company partners and employees that have already confused the two companies.  *Morningside Grp. Ltd. v. Morningside Cap. Grp., L.L.C.*, 182 F.3d 133, 143 (2d Cir. 1999); Compl. ¶ 52.  This factor weighs slightly in Plaintiff's favor.

*          *          *

In sum, Plaintiff's mark is moderately strong, the marks are near identical, Plaintiff and Defendant operate in the same areas of commerce, and even sophisticated parties have confused the marks.  The remaining *Polaroid* factors are neutral or bear more on the degree of harm than on the likelihood of confusion.  In light of these factors, the Court concludes that Plaintiff has established liability for trademark infringement under the Lanham Act.

## II.    Trademark Infringement Under New York Common Law

The standards for trademark infringement and unfair competition under New York common law are "virtually identical" to the standard under the Lanham Act, "except that [New York law] requires an additional showing of bad faith."  *Lopez v. Adidas Am., Inc.*, 2020 WL 2539116, at *15 (S.D.N.Y. May 19, 2020) (quoting *TechnoMarine SA v. Jacob Time, Inc.*, 2012

WL 2497276, at *5 (S.D.N.Y. June 22, 2012)). Whereas "bad faith" is one of the eight factors that may be used to determine copyright infringement under the Lanham Act, it is not necessarily determinative since the test is completed holistically. *Polaroid Corp.*, 287 F.2d at 495.

Plaintiff sufficiently pleaded that Defendant acted in bad faith by continuing to use Plaintiff's intellectual property even after receiving multiple letters requesting that they cease and desist. This allows the Court to "reasonably infer" that Defendant acted in bad faith and is liable for copyright infringement under New York law. *TechnoMarine SA*, 2012 WL 2497276, at *5. Because Plaintiff has sufficiently established Defendant's liability under the Lanham Act and Defendant's bad faith, the Court finds that Plaintiff has established Defendant's liability for common law trademark infringement. *See Lopez*, 2020 WL 2539116, at *15.

## III.    Trademark Dilution Under New York General Business Law § 360-l

Plaintiff alleges trademark dilution under New York General Business Law § 360-l which provides for "injunctive relief" when there is a "likelihood of injury to business reputation or of dilution of the distinctive quality of a mark or trade name." "Unlike claims for trademark infringement, no proof of 'competition between the parties or . . . confusion as to the source of goods or services' is required." *Disney Enters., Inc. v. Sarelli*, 322 F. Supp. 3d 413, 439 (S.D.N.Y. 2018) (quoting N.Y. Gen Bus. Law § 360-l); *see also Hormel Foods Corp.*, 73 F.3d at 506 ("This injury to the mark's selling power need not involve any confusion as to source or sponsorship."). Instead, to establish dilution, Plaintiff must demonstrate "(1) ownership of a distinctive mark, and (2) a likelihood of dilution." *Id.* at 506; *see also Kaplan, Inc. v. Yun*, 16 F. Supp. 3d 341, 352 (S.D.N.Y. 2014) ("To prevail on a claim for trademark dilution under New York law, the plaintiffs must show '(1) that it possesses a strong mark—one which has a distinctive quality or has acquired a secondary meaning . . . and (2) a likelihood of dilution by either blurring or tarnishment.'"

(quoting *Fireman's Ass'n of State of N.Y. v. French Am. Sch. of N.Y.*, 41 A.D.3d 925, 929 (N.Y. 2007))).

The first factor, ownership of a "distinctive mark," requires that the mark at issue is one with a "distinctive quality or [that] has acquired a secondary meaning such that the trade name has become so associated in the public's mind with the plaintiff that it identifies goods sold by that entity as distinguished from goods sold by others." *Gucci Am., Inc. v. Guess?, Inc.*, 868 F. Supp. 2d 207, 241 (S.D.N.Y. 2012) (citation omitted); *see also Fireman's Ass'n*, 41 A.D.3d at 929. For the same reasons Plaintiff has established Defendant's liability pursuant to the Lanham Act, Plaintiff has established that its mark is inherently distinctive.

The second factor, dilution, may be established through "blurring," which occurs "where the defendant uses or modifies the plaintiff's trademark to identify the defendant's goods and services[.]" *Deere & Co. v. MTD Prods., Inc.*, 41 F.3d 39, 43 (2d Cir. 1994).

"Traditionally, the likelihood of blurring has been governed by a six-factor test: (1) similarity of the marks, (2) similarity of the products covered, (3) sophistication of the consumers, (4) predatory intent, (5) renown of the senior mark, (6) renown of the junior mark. *The Sports Auth., Inc. v. Prime Hosp. Corp.*, 89 F.3d 955, 966 (2d Cir. 1996). The first five factors bear a marked similarity to the *Polaroid* factors. *See Lapine v. Seinfeld*, 375 F. App'x 81, 85 (2d Cir. 2010) ("To determine the likelihood of dilution by blurring, courts consider six factors similar to the *Polaroid* factors, and assess the similarity of the marks 'in a similar fashion' as under federal trademark law." (citations omitted)); *Coty Inc. v. Excell Brands, LLC*, 277 F. Supp. 3d 425, 460 (S.D.N.Y. 2017) ("[T]he first five factors of the blurring test are similar to the *Polaroid* factors[.]" (citation omitted)). Thus, the only factor not yet addressed by the Court is the sixth—the renown of the junior mark. Neither Plaintiff nor Defendant has adduced any fact showing Defendant's

mark has any brand recognition or conducts its own marketing.  Accordingly, in combination with the Court's prior "likelihood of confusion analysis," the Court finds that Plaintiff has established Defendant's liability for state law trademark dilution by blurring.

## IV.    Permanent Injunction

Plaintiff seeks a permanent injunction to prohibit Defendant from continuing to infringe on Plaintiff's intellectual property rights.  Compl. at ECF 19.  Specifically, Plaintiff requests that Defendant and its affiliates be permanently enjoined from "(1) [u]sing [Plaintiff's] "Mintology" mark or any colorable imitation thereof; [and] (2) [u]sing any trademark that imitates or is confusingly similar to . . . [Plaintiff's] 'Mintology' mark." *Id.*

A court may enter a permanent injunction if the plaintiff has demonstrated: "(1) that [the plaintiff] suffered an irreparable injury; (2) that remedies available at law are inadequate to compensate for that injury; (3) that the balance of hardships between the parties warrants a remedy in equity for the plaintiff; and (4) that the public interest would not be disserved."  *eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006).  A permanent injunction is appropriate because all four factors weigh in Plaintiff's favor.

### A.    Irreparable Harm

"Irreparable harm exists in a trademark case when the party seeking the injunction shows that it will lose control over the reputation of its trademark . . . because loss of control over one's reputation is neither calculable nor precisely compensable."  *Int'l Council of Shopping Ctrs., Inc. v. Global Infotech LLC*, 2019 WL 2004096, at *5 (S.D.N.Y. May 7, 2019) (quoting *U.S. Polo Ass'n v. PRL USA Holdings, Inc.*, 800 F. Supp. 2d 515, 540 (S.D.N.Y. 2011)).  While courts may not simply presume irreparable harm in trademark cases, the long tradition of granting injunctive relief upon a finding of infringement "is not surprising, given the difficulty of protecting a right to

exclude through monetary remedies." *eBay Inc.*, 547 U.S. at 395 (Roberts, C.J., concurring); *see also Salinger v. Colting*, 607 F.3d 68, 82 (2d Cir. 2010) (similar).

A finding of irreparable injury is appropriate where, as here, Plaintiff has suffered irreparable harm to the goodwill and reputation associated with its Mintology division given the likelihood of confusion with Defendant's inferior product.  Compl. ¶¶ 33, 51; *see Spin Master Ltd.*, 463 F. Supp. 3d at 376; *Marks Org., Inc. v. Joles*, 784 F. Supp. 2d 322, 335 (S.D.N.Y. 2011) ("A plaintiff may also show a threat of irreparable injury by showing a threatened loss of good will and loss of ability to control its reputation.").

Furthermore, Plaintiff is entitled to "a rebuttable presumption of irreparable harm" by virtue of the Court's finding of liability as to Plaintiff's trademark infringement claim.  *See* 15 U.S.C. § 1116(a) ("A plaintiff seeking [a permanent injunction] shall be entitled to a rebuttable presumption of irreparable harm upon a finding of a violation identified in this subsection in the case of a motion for a permanent injunction."); *see also Hermes Int'l v. Rothschild*, 678 F. Supp. 3d 475, 488 (S.D.N.Y. 2023) (same).  Defendant has not rebutted this presumption.

### B.    The Availability Of Alternative Remedies

Plaintiff's injury is not readily compensable through alternative remedies at law, such as monetary damages.  As Judge Friendly explained, the difficulty of calculating lost profits in a trademark case may preclude an award of monetary damages:

> While an injured plaintiff would be entitled to recover the profits on the infringing items, this is often difficult to determine; moreover, a defendant may have failed to earn profits because of the poor quality of its product or its own inefficiency. Indeed, confusion may cause purchasers to refrain from buying either product and to turn to those of other competitors.  Yet to prove the loss of sales due to infringement is also notoriously difficult.  Furthermore, if an infringer's product is of poor quality, or simply not worth the price, a more lasting but not readily measurable injury may be inflicted on the plaintiff's reputation in the market.

*Omega Importing Corp. v. Petri-Kine Camera Co.*, 451 F.2d 1190, 1195 (2d Cir. 1971) (Friendly, C.J) (citation omitted); *see also Marks Org.*, 784 F. Supp. 2d at 335 (where trademark infringement has caused a loss of goodwill, "monetary damages do not redress the loss of a relationship with a client that would produce an indeterminate amount of business in years to come"). Given the many instances of confusion alleged and the high potential for further, incalculable confusion, monetary relief would not fully compensate Plaintiff for the ongoing harms it has suffered as a result of Defendant's continued use of its mark. Compl. ¶ 52. *See Hermes Int'l*, 678 F. Supp. 3d at 490.

Additionally, a "plaintiff has no adequate remedy at law where, absent an injunction, the defendant is likely to continue" its infringing conduct. *Pearson Educ., Inc. v. Vergara*, 2010 WL 3744033, at *4 (S.D.N.Y. Sept. 27, 2010). Courts in this Circuit have been willing to "infer from a defendant's default that it is willing to, or may continue its infringement." *Id.* (citing cases). In this case, both Defendant's default in this case and its failure to respond to Plaintiff's cease-and-desist letters suggest that it will continue to infringe without a permanent injunction. *Id.* ¶¶ 39, 42, 45, 47; Dkt. No. 18; *Pearson Educ.*, 2010 WL 3744033, at *4.

### C.    The Balance Of Hardship

Third, the balance of hardships favors Plaintiff. Plaintiff has identified hardships Defendant caused to Plaintiff's brand and reputation. Meanwhile, Defendant, "through [its] default, . . . [has] not identified any hardships for the Court to consider—nor could [it]." *Spin Master*, 463 F. Supp. 3d at 376. "[I]t is axiomatic that an infringer cannot complain about the loss of ability to continue its infringing conduct." *WPIX, Inc. v. ivi, Inc.*, 691 F.3d 275, 287 (2d Cir. 2012); *see also Int'l Council of Shopping Ctrs., Inc. v. Glob. Infotech LLC*, 2019 WL 2004096, at *5 (S.D.N.Y. May 7, 2019) (Nathan, J.) (same).

### D.    The Public Interest

The public has an interest in "being assured that the mark it associates with a product is not attached to goods of unknown origin and quality." *N.Y.C. Triathlon, LLC v. NYC Triathlon Club, Inc.*, 704 F. Supp. 2d 305, 344 (S.D.N.Y. 2010); *see also Hermes Int'l*, 678 F. Supp. 3d at 493 (same).  Due to the demonstrated potential for confusion and mistake caused by Defendant's use of the term "Mintology," a permanent injunction would serve the public interest.  Compl. ¶ 52.

*          *          *

As Plaintiff has satisfied all four factors , Plaintiff is entitled to a permanent injunction against Defendant, enjoining Defendant from:

(1) Using the "Mintology" mark to promote, market, advertise, or offer for sale any good or service in the United States that is not offered by Mintable Pte. Ltd., or is not authorized by Mintable Pte. Ltd.;

(2) Passing off, inducing, or enabling others to sell or pass off any good or service in the United States as a good or service offered by a genuine Mintology product that is not Mintology or not offered with Mintable Pte. Ltd.'s approval; and

(3) Further infringing Mintable Pte. Ltd.'s trademarks.

## V.    Attorneys' Fees

Under Section 35(a) of the Lanham Act, 15 U.S.C. § 1117(a), in "exceptional cases" a court "may award reasonable attorneys' fees to the prevailing party[.]"  The Second Circuit has held that "under the Lanham Act, an exceptional case is one that stands out from others in the manner articulated by *Octane Fitness*[.]"  *Sleepy's LLC v. Select Comfort Wholesale Corp.*, 909 F.3d 519, 530 (2d Cir. 2018) (citing *Octane Fitness, LLC v. ICON Health &Fitness, Inc.*, 572 U.S. 545, 554 (2014)).  Pursuant to *Octane Fitness*, "an 'exceptional' case is simply one that stands out from others with respect to the substantive strength of a party's litigating position (considering

23

both the governing law and the facts of the case) or the unreasonable manner in which the case was litigated." 572 U.S. at 554. *Octane Fitness* gave district courts wide latitude to determine whether a case is exceptional in a "case-by-case exercise of their discretion, considering the totality of the circumstances." *4 Pillar Dynasty LLC v. N.Y. & Co., Inc.*, 933 F.3d 202, 215 (2d Cir. 2019) (citing *Octane Fitness*, 572 U.S. at 554). "Relevant factors include 'frivolousness, motivation, objective unreasonableness (both in the factual and legal components of the case) and the need in particular circumstances to advance considerations of compensation and deterrence.'" *Id.* (citing *Octane Fitness*, 572 U.S. at 554 n.6).

The Court agrees with other "courts in this district that a '[d]efendant's default—standing alone—is not 'exceptional.'" *Antetokounmpo v. Costantino*, 2021 WL 5916512, at *7 (S.D.N.Y. Dec. 15, 2021) (collecting cases) *report and recommendation adopted sub nom. Antetokounmpo v. Constantino*, 2022 WL 36232 (S.D.N.Y. Jan. 4, 2022). Indeed, as courts in this district have acknowledged: "[f]ailing to answer a complaint does not constitute unreasonable litigation conduct; it is simply the absence of litigation conduct." *Travel Leaders Grp., LLC v. Corley*, 2019 WL 6647319, at *14 (S.D.N.Y. Dec. 5, 2019) (citation omitted), *report and recommendation adopted*, 2022 WL 950957 (S.D.N.Y. Mar. 30, 2022); *Experience Hendrix, L.L.C. v. Pitsicalis*, 2020 WL 3564485, at *15 (S.D.N.Y. July 1, 2020) (same), *report and recommendation adopted sub nom. Experience Hendrix, LLC v. Hendrix*, 2020 WL 4261818 (S.D.N.Y. July 24, 2020).

Considering all the circumstances, an award of reasonable attorneys' fees is warranted. Plaintiff's case is strong, as demonstrated by the evidence of Defendant's bad faith infringement and dilution. *Focus Prod. Grp. Int'l, LLC v. Kartri Sales Co., Inc. Marquis Mills, Int'l, Inc.*, 2023 WL 3815276, at *3 (S.D.N.Y. June 5, 2023) ("What particularly distinguishes this case from a

24

garden-variety one in which a trademark or patent holder has successfully established infringement of such rights, however, is defendants' willful infringement[.]").

An award of attorneys' fees is additionally appropriate here as "it furthers the goals of the Lanham Act, including deterrence of similarly willful conduct by defendants and other possible infringers." *Id.* Defendant's continued infringement after being put on notice by Plaintiff's cease-and-desist letters, coupled with its failure to appear in this litigation, displays willful conduct. *See id.*; *see also Focus Prods. Grp. Int'l LLC v. Katri Sales Co., Inc.*, 2023 WL 3815276, at *3–4 (S.D.N.Y. June 5, 2023) (continuing to infringe after ignoring cease-and-desist letters amounted to willful conduct supporting an award of attorneys' fees); *Doctor's Assocs., Inc. v. Patel*, 2019 WL 3916421, at *4 (S.D.N.Y. July 19, 2019) (explaining that a case is exceptional where infringement was willful and intentional, defendant failed to appear, and infringing conduct continued after receiving cease-and-desist letter).

As a general matter, the "starting point" and "lodestar" in analyzing whether claimed attorneys' fees are appropriate is "the product of a reasonable hourly rate and the reasonable number of hours required by the case." *Milea v. Metro-North R.R. Co.*, 658 F.3d 154, 166 (2d Cir. 2011); *see also Lilly v. City of New York*, 934 F.3d 222, 227–34 (2d Cir. 2019) (discussing calculation of reasonable hourly rates and reasonable number of hours expended). "The party seeking fees bears the burden of demonstrating that its requested hours and hourly rates are reasonable, and must provide a court with sufficient information to assess the fee application." *Zero Carbon Holdings, LLC v. Aspiration Partners, Inc.*, 2024 WL 3409278, at *4 (S.D.N.Y. July 15, 2024). The reasonableness of attorneys' fees must be evaluated by "adequate documentation supporting the attorneys' fees and costs," which "should normally [include] contemporaneous time

25

records indicating, for each attorney, the date, the hours expended, and the nature of the work done." *Wolinsky v. Scholastic, Inc.*, 900 F. Supp. 2d 332, 335–36 (S.D.N.Y. 2012).

Plaintiff has provided the Court with some supporting records of the attorneys' fees it has incurred.  Dkt. No. 27, Ex. A.  However, these records do not state the titles of those listed in the billing records or the activities corresponding to those time entries.  Accordingly, there is insufficient evidence of the reasonableness of Plaintiff's requested fees.  Plaintiff is ordered to submit detailed time entries that, among other things, identify the titles and activities of all professionals as well as to disaggregate the costs for which Plaintiff seeks reimbursement no later than July 26, 2024.

## CONCLUSION

Plaintiff's motion for default judgment is GRANTED.

Plaintiff's motion for a permanent injunction is GRANTED.  Defendant is hereby enjoined from:

(1) Using the "Mintology" mark to promote, market, advertise, or offer for sale any good or service that is not offered by Mintable Pte. Ltd., or is not authorized by Mintable Pte. Ltd.;

(2) Passing off, inducing, or enabling others to sell or pass off any good or service as a good or service offered by a genuine Mintology product that is not Mintology or not offered with Mintable Pte. Ltd.'s approval; and

(3) Further infringing Mintable Pte. Ltd.'s trademarks.

Plaintiff is ordered to submit detailed time entries that, among other things, identify the titles and activities of all professionals whose fees it seeks to recover as well as to disaggregate the costs for which Plaintiff seeks reimbursement no later than July 26, 2024.   Plaintiff is also directed to serve a copy of this Opinion and Order on Defendant and to file proof of service on

the docket.  Defendant shall have until August 9, 2024, to respond to the request for attorney's fees and costs.

The Clerk of Court is respectfully directed to close Dkt. No. 24.


SO ORDERED.


Dated: July 18, 2024
       New York, New York                    _____
                                                    LEWIS J. LIMAN
                                              United States District Judge